IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:10CR48 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | SENTENCING MEMORANDUM |
| JOSHUA T. HOLLAND, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court for sentencing. This memorandum supplements findings made on the record at a hearing on December 9, 2010.

I.   FACTS

Joshua Holland was indicted on February 10, 2010, for possession with intent to distribute 5 grams or more of a mixture or substance containing a detectable amount of cocaine base, i.e., "crack cocaine," in violation of 21 U.S.C. § 841(a)(1) and (b)(1). The record indicates that Holland was responsible for 5.8 grams of cocaine base. Filing No. 44, Presentence Investigation Report ("PSR") (sealed) at 5; Filing No. 38, Transcript of Plea Hearing ("Tr.") at 26-27.

On August 3, 2010, Congress passed the Fair Sentencing Act ("FSA" or "the Act") which increased the quantity of crack cocaine that triggers a sentence of 5 to 40 years from 5 grams to 28 grams and the quantity that triggers a sentence of 10 years to life from 50 grams to 280 grams. Fair Sentencing Act, Pub. L. 111-220, 124 Stat. 2372 (codified at 21 U.S.C. § 841 (2010)). Under the FSA, Holland would not be subject to a mandatory minimum penalty for the quantity he possessed and the maximum sentence for his crime

would be 20 rather than 40 years.  *See id.*  In exchange for the filing of an Information that would not allege a quantity and would bring Holland's case within the purview of the FSA's statutory penalties, the government sought an agreement that the Guidelines in place at the time of the plea agreement, rather than those to be promulgated in conformity with the FSA, would apply to the defendant.  The parties entered into a binding plea agreement under Fed. R. Crim. P. 11(c)(1)(C), agreeing that the defendant should be held responsible for between 5 grams and 20 grams of crack cocaine, that his base offense level was 24, his total offense level was 21, his criminal history category was III, and his sentence should be 46 months.  See Filing No. 34, Plea Agreement at 2-3; 44, PSR at 3.

On September 9, 2010, the government filed the Information, alleging that Holland possessed with intent to distribute a mixture or substance containing a detectable amount of crack cocaine, with no allegation of quantity.  Filing No. 30.  Under the Guidelines in effect on that date, a quantity of over 5 grams but less than 20 grams of crack cocaine resulted in a base offense level of 24.  U.S.S.G. § 2D1/1(c)(8) (2009).  Based on a Total Offense Level 21, after a 3-level adjustment for acceptance of responsibility, and a Criminal History Category III, the guideline imprisonment range is 46 to 57 months.  *Id.*, Sentencing table.  Under the Guidelines amendments that became effective on November 1, 2010, the base offense level for possessing between 5.6 grams and 11.2 grams of cocaine base is 18, producing a guideline range for a defendant in the position of Holland (at criminal history category III, after deduction of 3 levels for acceptance of responsibility) of 24 to 30 months.  *See* U.S.S.G. § 2D1.1(c)(11) (Supp. 2010).

At a change of plea hearing on September 8, 2010, the court accepted the defendant's plea of guilty to the Information, but withheld approval of the plea agreement

pending review of a presentence investigation report. Filing No. 36, Minute entry. The court expressed reservations concerning the applicability of the FSA and ordered further briefing on the issue.[1] Filing No. 38, Transcript of Plea Proceedings at 14-16.

The defendant is 23 years old. He has previous convictions for theft by unlawful taking, shoplifting, trespassing, possession of marijuana (less than an ounce), and driving while intoxicated. Filing No. 44, PSR (sealed) at 7-9. At the time of his sentencing, he resided at home with his parents. *Id.* at 12. He is single and has never been married, but has been in a relationship for eight years and has three children between the ages of 1 and 4. *Id.* At the time of sentencing, he was caring for the children while their mother worked. *Id.* He attended high school until 12th grade, but did not graduate. *Id.* at 13. He has been employed as a transfer technician at Marianna Industries and as a loader for United Parcel Service and has worked off and on for his father's tree service. *Id.* at 13-14.

He was diagnosed with ADHD at age 12 and was on medication until he was 17. *Id.* at 13. He began drinking alcohol and smoking marijuana at age 16. *Id.* He reported that he began smoking marijuana daily at age 18 and smoked crack cocaine two times per month for three months at age 21, but has not used drugs since August 2009. He also used OxyContin, Xanax, and PCP occasionally. He attended and successfully completed outpatient chemical dependency treatment at Lutheran Family Services in the summer of 2010.

---

[1]Although the defendant was allowed to enter a plea to the Information, the court noted that the indictment would not be dismissed until the sentencing and stated that if the court were to reject the plea agreement, the government could fall back on the Indictment. Filing No. 38, Transcript at 19.

At the defendant's sentencing hearing on December 9, 2010, the government urged the court to accept the Rule 11(c)(1)(C) agreement and to sentence the defendant to 46 months, in accordance with the agreement and in conformity with the pre-amendment Guidelines.  It argues that the FSA's reduced penalties do not apply to conduct that occurred before its enactment.  It relied on the so-called "general savings statute," 1 U.S.C. § 109,  as authority for the proposition that a court must apply a criminal statute in effect at the time of a defendant's offense, unless Congress expressly provides that the amendment or repeal of the criminal statute is retroactive.

The defendant argued that he had been presented with a Hobson's choice in connection with the plea agreement:  Rejecting the offer could subject him to a 5-year mandatory minimum penalty, while accepting the offer would lock in a sentence that was longer than the post-amendment Guidelines sentence.  He further argued that the plain language of the Fair Sentencing Act indicates that it is to apply to all cases that are not yet final.

For the reasons stated below, the court finds the general savings clause is inapposite.  The court finds that it is not reasonable under the circumstances to accept the parties' Rule 11(c)(1)(C) plea agreement.  The court finds, under the circumstances, that it would be unfair and unreasonable to accept the parties' binding plea agreement.  The court finds that fundamental fairness requires that the court sentence the defendant under the statute and the Guidelines in effect at the time of his sentencing.  In consideration of the sentencing factors under 18 U.S.C. § 3553(a), the court finds a sentence of a term of imprisonment of 24 months, followed by a term of supervised release of 3 years, is reasonable for this defendant.

## II.   DISCUSSION

### A.   Law

Facts that alter the maximum penalty function as traditional elements of a crime. *See* *Harris v. United States*, 536 U.S. 545, 560-61 (2002) ; *United States v. Turner*, 603 F.3d 468, 471 (8th Cir. 2010) (drug quantity is an element of the offense when it increases the relevant maximum punishment).  The government has a constitutional obligation to charge each element in the indictment, submit each element to the jury, and prove each element beyond a reasonable doubt.  *Harris*, 536 U.S. at 557; *see also* *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

Under Fed. R. Crim. P. 11(c)(1)(C), a plea agreement may specify that an attorney or the government will agree that a specific sentence or sentencing range is the appropriate disposition for a case and such a recommendation or request will bind the court once the court accepts the plea agreement.  Fed. R. Crim. P. 11 (c)(1)(C).  The court may accept the agreement, reject it, or defer decision until the court has reviewed the presentence report.  Fed. R. Crim. P. 11(c)(3)(A).  If the court rejects a Rule 11(c)(1)(C) plea agreement, the court must inform the parties that the court rejects the plea agreement; advise the defendant personally that the court is not required to follow the plea agreement; give the defendant an opportunity to withdraw the plea; and advise the defendant personally that if the plea is not withdrawn, the court may dispose of the case less favorably toward the defendant than the plea agreement contemplated.  Fed. R. Civ. P. 11(c)(5)(A)-(C).  Courts are not obligated to accept plea agreements and have discretion to reject those which are deemed involuntary or unfair.  *United States v. Kling*, 516 F.3d 702, 704 (8th Cir. 2008); *see also* *Virgin Islands v. Walker*, 261 F.3d 370, 375 (3d Cir.

2001) (stating that "[a] sentencing court can, of course, reject the results of a plea negotiation if it concludes that the resulting agreement is not in the best interest of justice"). Due process, as related to the validity of a plea of guilty, requires that the plea be voluntarily and understandingly made. *Kotz v. United States*, 353 F.2d 312, 314 (8th Cir. 1965). The understanding necessary to give validity to a plea includes knowledge and comprehension, not only of nature of the charge, but also of the penalty that can be imposed. *Id.* (noting that the plea must be made with full understanding of the consequences).

The statute that criminalizes drug possession and distribution, 21 U.S.C. § 841, is structured to provide three tiers of punishment, depending on the drug quantity involved in the offense. *See* 21 U.S.C. § 841 (b) (1) (A)(iii) (10 years to life); § 841(b)(1)(B) (iii) (5 to 40 years); 21 U.S.C. § 841(b)(1)(C) (no minimum and a maximum sentence of 20 years regardless of quantity). The Fair Sentencing Act increased the quantity of crack cocaine that triggers 5- to 40-year sentence from 5 grams to 28 grams and the quantity that triggers a 10-years to life sentence from 50 grams to 280 grams.[2] *Compare* 21 U.S.C. § 841(b)(1)(B)(iii) (2008) *with* 21 U.S.C. § 841(b)(1)(B)(iii) (2010). The Act also eliminated the five-year mandatory minimum sentence for simple possession of crack. 21 U.S.C. § 844(a) (2010). The Act increases some penalties as well. *See, e.g.*, Fair Sentencing Act, Pub. L. 111-220, § 4, 124 Stat. 2372, 2372 (codified at 21 U.S.C. § 841(B)(1)(b)

---

[2]Congress selected 28 grams as the trigger for the five-year mandatory minimum because the Sentencing Commission and other experts have concluded that less than one ounce is a retail/user-level quantity, while more than one ounce is the quantity sold by wholesalers. *See* Public Comment Letters Received by the United States Sentencing Commission in Response to Request for Public Comment on Proposed Amendment and Issues for Comment (Fair Sentencing Act of 2010), 75 Fed. Reg. 54700 (October 2010), correspondence from Sen. Richard Durbin to Hon. William Sessions dated Oct. 8, 2010 (available at http://www.ussc.gov/Meetings_and_Rulemaking/Public_Comment/20101013/index.cfm).

(2010)) (increasing fines); § 5, 124 Stat. 2372, 2372-73 (directing the Sentencing Commission amend the Guidelines to add a two-level Guideline increase if a defendant used, threatened or directed use of violence) (codified at 28 U.S.C. § 994 (2010); § 6, 124 Stat. 2372, 2373, (directing the Commission to provide a two-level increase for a variety of circumstances including bribery and "super-aggravating factors").   Additionally, Congress provided emergency authority to the Sentencing Commission to promulgate changes to the Guidelines and "to make such conforming amendments to the Federal sentencing guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law" as "soon as practicable, and in any event not later than 90 days after the date of enactment of this Act." *Id.,* § 8, 124 Stat. 2372, 2374.

Pursuant to that authority, the Sentencing Commission issued temporary emergency amendments effective November 1, 2010.   *See* Notice of a Temporary Emergency Amendment to Sentencing Guidelines and Commentary, 75 Fed. Reg. 66188-02, 66191, 2010 WL 4218801 (F.R.) (Oct. 27, 2010) (noting that to account for statutory changes, "the amendment conforms the guideline penalty structure for crack cocaine offenses to the approach followed for other drugs, i.e., the base offense levels for crack cocaine are set in the Drug Quantity so that the statutory minimum penalties correspond to levels 26 and 32," and other offense levels are established by extrapolating upward and downward).   The Commission noted that "[c]onforming to this approach ensures that the relationship between the statutory penalties for crack cocaine offenses and the statutory penalties for offenses involving other drugs is consistently and proportionally reflected throughout the Drug Quantity Table." *Id.*

Congress's stated goal in enacting the Fair Sentencing Act was "to restore fairness to Federal cocaine sentencing." Preamble, Fair Sentencing Act of 2010, Pub. L. 111-220, 124 Stat. 2372 (Aug. 3, 2010). The passage of the Fair Sentencing Act was the culmination of more than 15 years of discussion and policy debate over the harsh crack penalties in the Anti-Drug Abuse Act of 1986. *See* David Yellen, *The Sentencing Commission Takes on Crack, Again*, 20 Fed. Sent. R. 227, 227, 2008 WL 4489732, \*\*2 (April 2008). The Sentencing Commission had repeatedly urged Congress to reform crack penalties because they did not effectively comport with the purposes of sentencing and failed to reflect the relative culpability of drug offenders. *See, e.g.*, United States Sentencing Commission, *Report to Congress: Cocaine and Federal Sentencing Policy* (May 2007) ("2007 Report"); United States Sentencing Commission, *Report to Congress: Cocaine and Federal Sentencing Policy* (May 2002) ("2002 Report"); United States Sentencing Commission, *Special Report to Congress: Cocaine and Federal Sentencing Policy* (Apr. 1997) ("1997 Report"); United States Sentencing Commission, *Special Report to Congress: Cocaine and Federal Sentencing Policy* (Feb. 1995) ("1995 Report"). The Supreme Court acknowledges that "the crack/powder disparity produces disproportionately harsh sanctions, i.e., sentences for crack cocaine offenses 'greater than necessary' in light of the purposes of sentencing set forth in § 3553(a)." *Kimbrough v. United States,* 552 U.S. 85, 110; *Spears v. United States*, 129 S. Ct. 840, 843 (2009) (per curiam).

The Fair Sentencing Act was enacted because it had become clear that there was no evidentiary basis for the 100-to-1 crack/powder ratio and to remedy the racially discriminatory impact of the ratio. *See, e.g.,* 155 Cong. Rec. S10488-01, S10491, 2009 WL 3319524 (daily ed. Oct. 15, 2009) (statement of Sen. Richard Durbin noting that "the

8

crack/powder disparity disproportionately affects African Americans" and stating "[w]e now know the assumptions that led us to create this disparity were wrong."); *id.* at *S10492 (statement of Sen. Patrick Leahy that "the criminal justice system has unfair and biased cocaine penalties that undermine the Constitution's promise of equal treatment for all Americans"); *id.* (statement of Sen. Jeff Sessions that "the current system is not fair" and "we are not able to defend the sentences that are required to be imposed under the law today"); 156 Cong. Rec. H6196-01, *H6198, 2010 WL 2942883 (daily ed. July 28, 2010) (statement of Rep. James E. Clyburn that the 100-to-1 ratio was "unjust and contrary to our fundamental principles of equal protection under the law"); *H6199 (statement of Rep. Jackson Lee that "[t]his disparity made no sense when it was initially enacted, and makes absolutely no sense today," and acknowledging that "the current 100 to 1 penalty structure undermines various congressional objectives set forth in the Anti-Drug Abuse Act of 1986" in targeting Federal resources at low-level crack cocaine users and dealers);  *H6200 (finding that "[m]ost of the assumptions on which the current penalty structure was based have turned out to be unfounded"); *H6202 (statement of Rep. Daniel Lungren that "[w]e didn't really have an evidentiary basis for [the 100-to-1 ratio]"); *H6202 (statement of Rep. Bobby Scott that "there is no justification for the 100-to-1 ratio").  Another key rationale for the Act was to ensure that minor crack offenders would not be punished more severely than major cocaine dealers.  *See* News Release, Office of Senator Jeff Sessions, *Congress Approves Landmark Drug Reform Compromise from Sessions and Judiciary Colleagues* (July 28, 2010)(available at    http://sessions.senate.gov/public/index.cfm? FuseAction=PressShop.NewsReleases (stating "the disparity between crack and powder cocaine sentencing has now been significantly reduced to better and more strategically

target federal resources at those who distribute wholesale quantities of narcotics"). Notably, a bill that would have specifically provided that it would not take effect for 180 days and would have had no retroactive application was earlier rejected. *See* H.R. 4545, 110th Cong. (1st Sess. 2007).

Recently, Senators Richard Durbin and Patrick Leahy clarified Congress's intentions in a letter to United States Attorney General Eric Holder dated Nov. 17, 2010 (available at http://sentencing.typepad.com/sentencing_law_and_policy/2010/11/senators-leahy-and-durbin-write-letter-to-attorney-general-holder-urging-application-of-fsa-to-pendi.html). Senators Durbin and Leahy acknowledge the "sense of urgency" that motivated the directive for the commission to promulgate emergency amendments, noting that "[e]very day that passes without taking action to solve this problem is another day that people are being sentenced under a law that virtually everyone agrees is unjust." *Id.* at 1. The Senators state that they are "disturbed" by the Department of Justice ("DOJ") position that the Fair Sentencing Act does not apply to defendants in cases pending at the time of the enactment, and characterize the result of the position as "absurd" and "obviously inconsistent with the purpose of the Fair Sentencing Act." *Id.* They urge the Attorney General "to seek sentences consistent with the Fair Sentencing Act" as a matter of prosecutorial discretion. *Id.*

Before the Fair Sentencing Act was passed, the DOJ recognized "the mounting evidence that the current cocaine sentencing disparity is difficult to justify based on the facts and science," and advocated  completely eliminating the sentencing disparity between crack and powder cocaine.  *Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity: Hearing before the S. Judiciary Comm.,*

*Subcomm. on Crime and Drugs,* 11th Cong. 9-10 (April 29, 2009) (statement of Lanny A. Breuer, Assistant Attorney General, Criminal Division) (available at http://judiciary.senate.gov/hearings/testimony.cfm?id=3798&wit_id=7836 or sentencing.typepad.com/sentencing_law_and_policy/2009/04/dojs-basic-gameplan-while-urging-crack-sentencing-reform-from- congress.html). The DOJ called for reassessment of the federal cocaine sentencing policy in light of evolving understanding of the effects of crack and powder cocaine and the need to ensure fundamental fairness in sentencing laws. *Id.,* Breuer Statement at 3. It stated that "[until a comprehensive solution—one that embodies new quantity thresholds and perhaps new sentencing enhancements—can be developed and enacted as legislation by Congress and as amended guidelines by the Sentencing Commission, federal prosecutors will adhere to existing law," but, recognizing that "federal courts have the authority to sentence outside the guidelines in crack cases or even to create their own quantity ratio in upcoming cases, . . . [o]ur prosecutors will inform courts that they should act within their discretion to fashion a sentence that is consistent with the objectives of 18 U.S.C. § 3553(a)." *Id.*

United States Attorney General Eric Holder stated in public remarks that "[i]t is the view of this Administration that the 100-to-1 crack-powder sentencing ratio is simply wrong. It is plainly unjust to hand down wildly disparate prison sentences for materially similar crimes. It is unjust to have a sentencing disparity that disproportionately and illogically affects some racial groups." Attorney General Eric Holder, Remarks as Prepared for Delivery by Attorney General Eric Holder at the D.C. Court of Appeals Judicial Conference (June 19, 2009) (available at www.usdoj.gov/ag/speeches/2009/ag-speech-090619.html.) The Attorney General later stated that "[t]here is no law enforcement or sentencing

rationale for the current disparity between crack and cocaine powder offenses, and I have strongly supported eliminating it to ensure our sentencing laws are tough, predictable and fair," noting that he looked forward to "the Senate and the House approving this legislation quickly so that it can be signed into law."  Statement of the Attorney General on Senate Judiciary Committee's Approval of the Fair Sentencing Act (March 11, 2010) (available at http://www.justice.gov/ag/speeches/2010/ag-speech-100311.html).  Earlier, Holder had testified before the Senate Judiciary Committee that "[t]he stakes are simply too high to let reform in this area wait any longer."  *Oversight of the Department of Justice: Hearing Before the S. Judiciary Comm.,* 111th Cong 10 (November 18, 2009) (statement of Attorney General Eric Holder)(available at http://www.justice.gov/ag/testimony/2009/ag-testimony-0911181.html   or http://judiciary.senate.gov/hearings/testimony.cfm?id=4172&wit_id=8318)

The Constitution's *ex post facto* clause "forbids the application of any law or rule that increases punishment to preexisting criminal conduct."  U.S. Const. Art. 1, § 9, cl. 3. "To fall within the *ex post facto* prohibition, a law must be retrospective—that is, 'it must apply to events occurring before its enactment'—and it 'must disadvantage the offender affected by it,' by altering the definition of criminal conduct or increasing the punishment of the crime." *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (quoting *Weaver v. Graham*, 450 U.S. 24, 29 (1981)).  The Sentencing Guidelines are subject to the *ex post facto* clause.  *See United States v. Bell*, 991 F.2d 1445, 1452 (8th Cir. 1993).  Accordingly, retroactive application of harsher Guidelines violates the *ex post facto* clause.  *See id* at 448. Because an amendment to a Sentencing Guideline has the potential to increase a defendant's punishment for a crime committed prior to the amendment, the *ex post facto*

clause is violated if a defendant is sentenced under the Guidelines in effect at the time of sentencing when those Guidelines produce a sentence harsher than one permitted under the Guidelines in effect at the time the crime is committed. *Id.*

When the Supreme Court announces new rules of substantive or procedural law, those rules apply to all cases that are not yet final. *Griffith v. Kentucky*, 479 U.S. 314 (1987). A conviction does not become final until the expiration of direct review. *See Kapral v. United States*, 166 F.3d 565, 577 (3d Cir. 1999). This rule of retroactivity has "constitutional underpinnings." *Danforth v. Minnesota*, 552 U.S. 264, 278 n.15 (2008). One rationale for the rule is the actual inequity of violating the principle of treating similarly situated defendants the same. *Griffith,* 479 U.S. at 323.

Under the criminal sentencing statutory scheme, the Sentencing Guidelines that govern a defendant's sentence are those in effect at the time of the sentencing. 18 U.S.C. § 3553(a)(4)(A)(ii); *see also* U.S.S.G. § 1B1.11, p.s. Thus, in the two decades of the Guidelines' existence, whenever the Commission has adopted Guideline amendments, those amendments have applied to all defendants sentenced thereafter, regardless of when the crime was committed. *See, e.g., United States v. Valladares*, 304 F.3d 1300, 1302 (8th Cir. 2002). Because of *ex post facto* concerns, a district court must apply the guideline in effect at the time the crime was committed only if application of the guideline in effect at the time of sentencing would result in a more severe sentence. *United States v. Valladares*, 304 F.3d 1300, 1302 (8th Cir. 2002). Under the Sentencing Reform Act's provision, the new Guideline alterations of base offense levels for trafficking in various quantities of crack cocaine will apply to all sentencing after November 1, 2010. 18 U.S.C. § 3553 a)(4)(A)(ii).

The Sentencing Commission is authorized under sentencing statutes to decide whether to amend the Guidelines, and to determine whether and to what extent an amendment will be retroactive. *See* 28 U.S.C. § 994 (o) & (u); *Dillon v. United States*, 130 S. Ct. 2683, 2688 (June 17, 2010). The Commission had amended the Guidelines for crack offenses in 2007, but had no authority to modify sentences imposed under the mandatory minimum statutes. *See* Notice of Submission to Congress of Amendments to the Sentencing Guidelines effective November 1, 2007, 72 Fed. Reg. 28558-01, 2007 WL 1459813 28 (May 21, 2007); *United States Sentencing Commission Votes to Amend Guidelines for Terrorism, Sex Offenses, Intellectual Property Offenses, and Crack Cocaine Offenses* (April 27, 2007) (available at http://www.ussc.gov/Legislative_and_Public_ Affairs/Newsroom/Press_Releases/archives.cfm) (emphasizing the Commission's "strong view" that the amendment was only a partial solution to problems associated with the 100-to-1 drug quantity ratio and that "[a]ny comprehensive solution to the 100-to-1 drug quantity ratio would require appropriate legislative action by Congress"). The Commission  later voted unanimously to give those Guidelines amendments retroactive effect, noting that it "made its decision on retroactivity of the crack cocaine amendment after months of deliberation and years of examining cocaine sentencing issues" including over 33,000 letters or written comments and a full-day hearing. *U.S. Sentencing Commission Votes Unanimously to Apply Amendment Retroactively for Crack Cocaine Offenses* (Dec. 11, 2007) (available at http://www.ussc.gov/Legislative_and_Public_Affairs/Newsroom/Press_ Releases/archives.cfm).

The common-law presumption was "that the repeal of a criminal statute resulted in the abatement of 'all prosecutions which had not reached final disposition in the highest

court authorized to review them.'" *Bradley v. United States*, 410 U.S. 605, 607 (1973) (noting that a prosecution terminates when a sentence is imposed). The first general saving provision was enacted in 1871 to abolish that presumption. *Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 660 (1974) (noting that Congress enacted the savings statute to avoid abatements that were "often the product of legislative inadvertence").[3] The savings clause supplies a general rule of statutory construction that prescribes the effect of a repealing statute on an existing penalty in the absence of congressional intent to the contrary. *Great Northern Ry. Co. v. United States*, 208 U.S. 452, 465 (1908) (emphasis added); *Martin v. United States*, 989 F.2d 271, 276 (8th Cir. 1993) ("Just as the rule of construction is inapplicable when Congress expressly intends a repeal to have immediate effect, we believe that resort to this rule of construction may be unnecessary when Congress specifically provides that a statutory repeal will have purely prospective effect"). However, the savings statute need not be enforced if, "either by express declaration or necessary implication arising from the terms of the law as a whole, it results that the legislative mind will be set at naught by giving effect to the [saving statute]." *Great Northern Ry. Co*, 208 U.S. at 465. The provision is to be interpreted, read, and construed "in order to give effect to the will and intent of Congress." *Hertz v. Woodman*, 218 U.S. 205, 217 (1910).

---

[3]Unlike the statute at issue in *Marrero*, 417 U.S. at 659, there is no saving clause in the Fair Sentencing Act itself. Also, there is another important distinction between *Marrero* and this case. In *Marrero*, the defendant had already been sentenced and was serving his sentence before the new law was enacted. *Id.* at 655. Under the law in effect when Marrero was sentenced, the sentencing judge sentenced him with the understanding that he was not eligible for parole. *Id.* A statute enacted after he was sentenced would allow parole, but the Supreme Court found that under the statute's own saving clause as well as the general saving statute, the prohibition on parole remained intact. *Id.* at 658.

Even with statutory language that is "clearly delineated," exceptions may be implied "where essential to prevent 'absurd results' or consequences obviously at a variance with the policy of the enactment as a whole." *United States v. Rutherford*, 442 U.S. 544, 552 (1979). The Supreme Court imputes to Congress "an intention to avoid inflicting punishment at a time when it can no longer further any legislative purpose, and would be unnecessarily vindictive." *Hamm v. City of Rock Hill*, 379 U.S. 306, 308 (1965); *United States v. Chambers*, 291 U.S. 217, 222-23 (1934); *Massey v. United States*, 291 U.S. 608 (1934); *see also United States v. Mechem*, 509 F.2d 1193, 1196 (10th Cir. 1975) (finding that the stated purpose of a congressional enactment to avoid prosecution of juveniles as criminals and the enactment's recognition of a need for "immediate and comprehensive action," furnished the basis for the conclusion that "Congress did not intend the ordinary criminal process to continue, through the saving statute, to reach juveniles not yet tried."). Congress's intent to apply a statute to pending cases does not have to be expressed in explicit language of the statute itself, but may be revealed by studying the context of the statute as a whole. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Abbott v. United States*, — U.S. —, 131 S. Ct. 18 (finding strong contextual support for its interpretation of a statutory provision and stressing that a contrary reading "would result in sentencing anomalies Congress surely did not intend").

Where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant. *United States v. Bass*, 404 U.S. 336, 348 (1971) (describing the "rule of lenity"). The "rule of lenity" principle of statutory construction applies not only to interpretations of the substantive ambit of criminal prohibitions, but also to the penalties they impose. *Bifulco v. United States*, 447 U.S. 381, 387 (1980). Statutory interpretative

16

principles should "give the rule of lenity special force in the context of mandatory minimum provisions," because an interpretive error on the side of leniency still permits the sentencing judge to impose a sentence that will serve all other sentencing goals set forth by Congress in other statutory provisions. *Dean v. United States,* 129 S. Ct. 1849, 1860-61 (2009) (Breyer, J., concurring); *see also Leocal v. Ashcroft,* 543 U.S. 1, 11 n.8, (2004) (ambiguities in criminal statutes referenced in immigration laws should be construed in the noncitizen's favor).

The Sentencing Guidelines are no longer mandatory and the range of choice in sentencing dictated by the facts of the case has been significantly broadened. *See United States v. Booker,* 543 U.S. 220, 260-61 (2005); *Gall v. United States,* 552 U.S. 38, 59 (2007); *Kimbrough v. United States,* 552 U.S. 85, 101 (2007); *Rita v. United States,* 551 U.S. 338, 349-50 (2007); *Cunningham v. California,* 549 U.S. 270, 286-87 (2007). District courts must "give respectful consideration to the Guidelines," but are permitted "'to tailor the sentence in light of other statutory concerns as well.'" *Kimbrough,* 552 U.S. at 101 (quoting *Booker,* 543 U.S. at 245-246). In imposing a sentence, the district court must consider the factors set out in the Sentencing Reform Act at 18 U.S.C. § 3553(a), including the nature of the offense, history and characteristics of the defendant, the need to deter criminal conduct, and the need to protect the public from further crimes by the defendant. *See*, e.g., *Gall,* 552 U.S. at 41, 49-50 & n.6; *Booker,* 543 U.S. at 259-60; *Nelson v. United States,* 129 S. Ct. 890, 891-92 (2009). That statute "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough,* 552 U.S. at 101 (quoting 18 U.S.C. § 3553(a)). The Guidelines remain "the starting point and the initial benchmark" in

determining a sentence. *Gall, 552 U.S. at 49*. However, the district court "may not presume that the Guidelines range is reasonable," but must "make an individualized assessment based on the facts presented." *Id.* at 50; *Nelson, 129 S. Ct. at 892* ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be *presumed* reasonable") (emphasis in original). The sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors explaining any variance from the former with reference to the latter. *Nelson, 129 S. Ct. at 891-92*.

III.  ANALYSIS

A.  The plea agreement

The court first finds that the Rule 11(c)(1)(C) plea agreement is unfair and unreasonable and should be rejected. Under the circumstances, the defendant did not have sufficient understanding, knowledge of and comprehension of the penalties he faced to enable him to enter into a valid agreement. The considerable discussion between counsel for both parties and the court on the issue of the effect the agreement's appeal waiver on defendant's ability to seek redress in the event of future enactments or legal decisions that would give the FSA retroactive effect shows that the defendant could not have fully appreciated the consequences of the agreement. The law in this area remains in a state of flux.[4] The court is not convinced that the defendant could have knowingly and

---

[4]In *United States v. Brewer, 624 F.3d 900, 909 n.7 (8th Cir. 2010)*, the Eighth Circuit Court of Appeals stated in dicta that "because the Fair Sentencing Act contains no express statement that it is retroactive . . . the 'general savings statute,' 1 U.S.C. § 109, requires us to apply the penalties in place at the time the crime was committed." However, that case involved a defendant who was convicted and sentenced before the Fair Sentencing Act was enacted. Similarly, cases in other circuits that have refused to apply the more lenient mandatory minimum sentences of the Fair Sentencing Act to criminal conduct that occurred before the date of the FSA's enactment all involve defendants who had already been sentenced before August 3,2010. *See United States v. Bell, 624 F.3d 803, 814 (7th Cir. 2010); United States v. Gomes, 621 F.3d 1343, 1346 (11th Cir. 2010); United States v. Carradine, 621 F.3d 575, 579-81 (6th Cir. 2010)*. Those cases are inapposite.

voluntarily agreed to the terms of the Rule 11(c)(1)(C) sentence.  Accordingly, the court finds that justice would not be served by accepting the agreement.

   B.   The FSA and Guidelines penalties

The court finds that fundamental fairness requires the court to consider the Guidelines in effect at the time of the defendant's sentencing and the penalties under the FSA in fashioning a sentence for the defendant.  The court finds that the government's reliance on the savings clause for the proposition that the pre-amendment Guidelines apply is misplaced.  The savings clause applies only in the absence of an expression of congressional intent.  The court finds that it is clear in the text and structure of the Fair Sentencing Act, in conjunction with the other congressional enactments that establish the overall federal criminal sentencing scheme, that Congress intended the Act to apply to cases pending at the time of the enactment.  This intention is expressed in its directive to the Sentencing Commission to promulgate emergency amendments conforming Guidelines penalties to the new statutory crack cocaine penalties.  The directive to the Commission was designed to ensure consistency in sentencing.  The Commission had sought such emergency authority in its 2007 report, in order to "enable the Commission to minimize the lag between any statutory and guideline modifications for cocaine offenders."  *See* 2007 Report at 9.  The "consistency" that Congress sought to achieve through the directive is a match between the statutory sentences and Guidelines sentences for crack offenses.

---

Whether the FSA can or should be applied to cases pending "in the pipeline" is a different question.  The issue presented here is not the "retroactive" application of a new statute.  The issue is whether it is patently unfair to sentence a defendant who had not been convicted at the time the FSA was enacted to penalties that Congress has abrogated, finding them arbitrary, unfair and discriminatory.  As the term is used in habeas corpus jurisprudence, applying a law "retroactively" means applying it to cases that have already become final by completion of direct review.  *Burton v. Fabian*, 612 F.3d 1003, 1008 (8th Cir. 2010); *see also* *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) ("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases . . . pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past").

Congress had earlier enacted the statute that requires defendants to be sentenced under the Guidelines in effect at the time of sentencing, and was surely aware of that provision. The grant of emergency amendment authority to the Commission shows that Congress intended and expected that the new crack penalties would be applied as soon as possible.

The expressed goal of consistency is evidence of the underlying intent to apply the lower penalties provided in the Fair Sentencing Act to pending cases, just as the amended Guidelines would be applied to pending cases. The directive indicates that Congress considered the interplay between the Guidelines and the Fair Sentencing Act and anticipated that the statute and Guidelines would be congruent.

The legislative history of the Fair Sentencing Act bolsters the court's conclusion. Devining congressional intent in these circumstances is not an arcane inquiry into antiquated archives. The congressional hearings and debate on this issue are recent, accessible and voluminous. Members of Congress have clearly elucidated their positions in public statements. The crack penalty reforms did not occur in a vacuum. Recent legal developments and changes in the sentencing climate are well known to the court and to the criminal bar.

The government's argument rests exclusively on the saving statute's provision that the repealing act "shall so expressly" provide that a previously harsher penalty is to be released or extinguished. Under the government's approach, the omission of such "express" language is the end of the statutory construction exercise. The government's argument ignores caselaw that explains that the 1871 saving clause "cannot justify a disregard of the will of Congress as manifested either expressly or by necessary implication in a subsequent enactment." *See Great N. Ry. Co.*, 208 U.S. at 465; *Marrero*, 417 U.S.

20

at 659 n.10 (describing the *Great Northern* principle as applying to later congressional will manifested by "fair implication or expressly.")  It would be illogical to ignore Congress's stated and implied objectives in order to exalt a hypertechnical interpretation of an antiquated statute.  Doing so would also diminish the effectiveness of the remedial advisory Guidelines scheme as envisioned by the Supreme Court.

A finding that the lowered penalties are not applicable to pending cases defies logic. The statute of limitations for drug distribution offenses is five years.  *See* 18 U.S.C. § 3282(a).  Under the government's interpretation, a court would be required to impose sentences that are universally regarded as unfair and discriminatory, to all crack crimes committed in the five years prior to the date of the FSA'a enactment.  Given the prevalence of lengthy, ongoing drug conspiracies, it is not unreasonable to assume that there will be a fair number of such prosecutions.  Adopting the government's position would set up a two-tiered system of sentencing that is wholly at odds with the simplicity of the Guidelines provision that mandates the application of the Guidelines in effect at the time of sentencing, absent *ex post facto* concerns.

The government's argument blurs the distinction between a defendant who has already been sentenced and those defendants, like this one, who have yet to be sentenced, or even convicted.  Concerns about judicial economy and the finality of judgments could justify some limitations on reopening or relitigating sentences with respect to the former, but such concerns have no application where there is nothing to relitigate or reopen.  Judicial economy would be better served with a simple, straightforward rule that the Fair Sentencing Act applies to pending cases, just as the Guidelines in effect at the time of sentencing apply.  Further, the provisions of the Fair Sentencing Act that disadvantage an offender cannot be applied because of *ex post facto* concerns.  Judicial

economy is not served by a piecemeal and ad hoc application of the FSA's provisions.  The government has not identified any valid congressional interest that would be served by continuing to apply the now discredited and repudiated 100-to-1 ratio to those defendants who are now categorized as minor crack offenders.

Also, the savings clause is not to be applied in circumstances that lead to an absurd result.  To continue to sentence defendants under a formula that has now been found unfair, unjust, unnecessary and discriminatory is such an absurd result.  Application of the savings clause under these circumstances would have the result of setting the legislative mind "at naught."  Such action would frustrate the expressed congressional goals of remedying racially discriminatory impact, ensuring that more culpable offenders are punished more harshly, and achieving consistency with the Guidelines.

Based upon the language and structure, legislative history, and motivating policies of the Fair Sentencing Act and the Sentencing Reform Act of 1984, the court finds Congress did not want federal judges to continue to impose harsher sentences after the enactment of the FSA merely because the criminal conduct occurred before the enactment.  Congress made clear the urgency of the change out of its concern for fairness.  It is a necessary or fair implication from the urgency reflected in the grant of emergency authority that Congress intended the FSA penalties and concomitant Guidelines base offense level adjustments to apply to pending cases.

To assign more force to the "expressly" language of the general saving statute, a neutral rule of construction, than to the purpose, language, context, and legislative history of the Fair Sentencing Act and Sentencing Reform Act would produce an odd result and would render the emergency authority meaningless.   The government points to no

provision in the FSA that would indicates that Congress intended that the FSA would not apply to pending cases.  There is little force to the argument that the lack of any mention of retroactivity means that Congress must have intended the saving statute to operate to avoid application of the FSA to past cases.  It is just as likely that the omission of language on retroactivity means the opposite:  Congress knows how to include express language that an old law should continue to apply, as shown in the Comprehensive Drug Abuse Prevention and Control Act of 1970, the statute at issue in *Marrero*.

Moreover, even if congressional intent were unclear, both the rule of lenity and the constitutional avoidance canon call for the Fair Sentencing Act to be applied to cases pending at the time of its enactment.  To the extent that the statute is ambiguous, it should be construed in favor of a criminal defendant.  Application of the Fair Sentencing Act to cases in the pipeline will avoid any potential constitutional issue.  Applying the discredited 100-to-1 ratio to defendants who committed an offense before August 3, 2010, but who have not yet been convicted has Constitutional implications.  Arguably, the Equal Protection Clause is implicated, both because the harsh penalties have disparate racial effects and because offenders are treated differently.  The Eighth Amendment may be implicated as well because the severity of the punishment is out of proportion to the culpability of a defendant who committed the crime prior to August 3, 1020, vis-a-vis one who committed the same crime after that date.  Most importantly, however, the continued application of a criminal penalty that fails to serve any legitimate governmental objective would be so arbitrary and irrational that it would violate a defendant's right to due process.  Also, because a defendant's maximum sentence, as well as the mandatory minimum sentence, is affected by the Act, the Fifth and Sixth Amendment concerns addressed in

*Apprendi,* 530 U.S. at 490*, Blakely v. Washington.* 542 U.S. 296, 301-02 (2004) and

*Booker,* 543 U.S. at 260, are potentially implicated.

Finally, the government's present position is at odds with its professions to Congress

and the public. The DOJ has publicly acknowledged that the pre-FSA penalties for crack

cocaine are overly harsh, discriminatory, and unfair.  To now call for their continued

application is inconsistent at best and hypocritical at worst.  The Department of Justice's

present position is in irreconcilable conflict with its earlier statements.

C.   Defendant's sentence

The court adopts the findings in the PSR.  The court finds, however, that the statute

and Guidelines in effect at the time of sentencing should be applied.  The defendant's base

offense level is 18, his total offense level is 15, and his criminal history category is III,

resulting in a Guidelines sentencing range of 24 to 30 months.[5]  The court finds that a term

of imprisonment of 24 months, followed by a term of supervised release with the imposition

of special conditions as set forth in the court's judgment, Filing No. 47, is appropriate for

the defendant.  A sentence of two years is sufficient, but not greater than necessary, to

accomplish the goals of sentencing.

Even if the pre-amendment Guidelines were applied, the court would impose the

same sentence in consideration of the sentencing factors under 18 U.S.C. § 3553(a).  The

lower statutory penalties and Guidelines sentencing ranges are relevant to the court's

determination of the seriousness of the defendant's crime and the sentence necessary to

---

[5]At the sentencing hearing, the court mistakenly stated that the defendant's base offense level was 24 and total offense level was 21, but stated that the defendant's Guidelines range was 24 to 30 months, which is the range under the amended Guidelines.  It was clear from the context of the hearing that the court intended to apply the amended Guidelines.  The statement of reasons will be amended to reflect that the defendant's base offense level is 18 rather than 24 to reflect the change in penalties under the FSA.

deter further crimes and protect the public.  The amended penalties show that distribution of crack cocaine is no longer considered as grave a danger to the public as it once was. A sentence of 24 months will be sufficient, but not longer than necessary to deter the defendant's future criminal conduct and to protect the public.

In considering the history and characteristics of the defendant, the court first notes that the defendant is only twenty-three years old.  His previous criminal activity, although consistent with gang involvement, was generally related to drug and alcohol abuse, and the defendant has since completed treatment for his addiction.  The defendant contends that he is not involved in a gang, although he grew up with gang-members and was surrounded by gang culture in his youth.  The defendant characterizes himself as a one-time gang "wanna-be."  Although the court shares the government's concerns with respect to gang activity, the court believes that the defendant is sincere in his desire to turn his life around.  The court notes that the defendant has a supportive family, has complied with the conditions of pretrial release, has not had any positive drug tests and has not associated with a criminal element while on pretrial release.  The provision of a special condition of supervised release requiring that he may not associate with any member, prospect, or associate member of any criminal street gang will help to facilitate that goal and will protect the public in the future.  Further, the court will recommend that the defendant participate in the 500-hour inpatient drug treatment provided by the Bureau of Prisons.

The need to avoid sentencing disparities is accomplished by the relative proportionality of the defendant's sentence to the sentences imposed on high level distributors with far greater culpability than the defendant, as well as its proportionality to defendants convicted of powder cocaine distribution.  A sentence of 24 months is a

significant term of imprisonment that greatly exceeds sentences of incarceration that the defendant has served in the past.  This sentence respects the distinction between the culpability of low- and high-level distributors and promotes respect for the law.

DATED this 10th day of January, 2011.

BY THE COURT:


s/ Joseph F. Bataillon
Chief United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.